# EXHIBIT B

Page 1

- - -

DENNIS M. DANZIK and RDX            :
TECHNOLOGY CORPORATION, (fka        :
Ridgeline Energy Services, Inc.)   :
                                    :
        v.                          :
                                    :
CWT CANADA II LIMITED               :
PARTNERSHIP, RESOURCE RECOVERY      :
CORPORATION, CHANGING WORLD         :
TECHNOLOGIES, JEAN NOELTING;        :
JANE DOE NOELTING; BRUCE            :
MCFARLANE; JANE DOE MCFARLANE;      :
BRIAN APPEL; and JANE DOE APPEL    :

- - -

AUDIO TRANSCRIPTION

- - -

Audio transcription of the 341 meeting held in the above-captioned matter on January 4, 2018, at 1:15 p.m., transcribed from an audio file.

- - -

MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com



Page 14

substantial amount of evidence that was found in a locker -- in a storage locker in Joplin, Missouri, that is under police investigation. They thought that at this point, with my appeal happening in New York during the month of January or February, that it was a good time to go in and get things cleaned up. And the sale of the property in Santa Fe Springs, which takes a great deal of personal debt off my -- of my books. About $2 million.

Q. Okay. Other than that change in debt, how have your financial circumstances changed since the dismissal of your last Chapter 11 case?

A. Well, I went out and talked to my clients about getting direct employment contracts if I went into Chapter 11. They have agreed to do that. As well as I've got all my income taxes filed excluding four amended years which are currently being done.

UNIDENTIFIED MALE: No employment contracts are listed.

Page 15

BY MR. MORSE:

Q. In terms -- one of the issues we had last case was your ability to have sufficient cash flow to fund a Chapter 11 plan.

Do you envision having sufficient excess cash flow to do that in this Chapter 11?

A. No, because I'm converting everybody over to an every-two-week payment schedule, and they pay me basically as a employee, not a contractor.

Q. Well, I'm not sure you understood my question.

Your last Chapter 11 case, the Court was concerned that you didn't have sufficient excess funds to pay creditors through a Chapter 11 plan.

A. Okay.

Q. And so this time around, one of our concerns is that you may be in that same situation.

And so do you have

Page 16

sufficient -- do you believe you'll have sufficient funds above your expenses to be able to contribute to a Chapter 11 plan and repay creditors sufficiently?

A. Yes. My current -- if everybody converts to an employment contract --- and after this meeting I'll report back -- I believe that they will -- I'll have approximately $740,000 a year in (inaudible).

Q. In -- I'm sorry. I lost -- I missed that last part. 740,000 in income?

A. That's correct.

Q. And your expenses for the year would be approximately how much?

A. Down -- down from (inaudible) a year.

Q. I'm sorry. You got -- it got garbled. Could you restate that?

A. Okay. I am about $155,000 a year not -- and that's excluding my -- my payments to the IRS.

Q. Okay. So you have

Page 17

approximately 600,000 in excess funds that you can use -- you can use to fund a Chapter 11 plan. Is that what you're saying?

A. That's correct.

Q. Okay.

A. I also have the -- on -- on the advice of our legal counsel in -- in Arizona, you know, we have a couple of substantial lawsuits that are proceeding forward as well.

Q. Okay. All right. Let me note that I do have concerns about this second filing. I'm leaning towards filing a motion to dismiss or convert early on. To the extent that gets held back at all, one of the expectations our office has is timely filing of monthly operating reports. That was an issue in your last case. You were delinquent on nearly every report.

And so, just to give you a heads up, I mean, there will be hardly no leeway in this case given your past

MAGNA LEGAL SERVICES

Page 170

transactions including the amount that you gambled as well as the amount that you've won or lost between December 2016 and today as part of your Chapter 11? Will you produce those documents to us?

A. Well, yeah, I have -- I have -- I have cash flow. I'm not going to give you my -- my -- my taxes unredacted. That's -- yeah. If I'm responsible for filing taxes on any gambling, I'll absolutely do it.

MR. MORSE: Let me interject, Mr. Wurtzel. After hearing your questioning and some of the answers and talking to Brad here, we definitely have concerns about some of the -- well, the information that's been provided as well as potential transactions that occurred in the prior case. And so I would like to get additional information regarding not only DAS but also Mr. Danzik's employment contracts.

Page 171

I have some concerns that money was flowing through DAS and being not channelled to the last bankruptcy estate, and potentially some of those funds and transfers of his earnings could have or should have -- well, it may -- they may have -- they possibly should have been disclosed on the SOFA as transfers to insiders.

So I think you've raised a number of issues. I'm not sure -- well, I think we should continue it. I want to get that information and then be able to ask additional questions. And I think what I want to do is do a 2004 motion and request -- request that information both from Mr. Danzik and DAS and then come back and reconvene and hopefully have a court reporter here as well.

I think the transcript today

Page 172

is not very good at all. I mean, there's been a lot of interruptions and people talking over each other, and so I'm just not sure it's going to be of much value. And so I'd like to get a clean -- a clean record.

I want to know what your thoughts are. I mean, do you want to keep going today or...

MR. WURTZEL: Mr. Morse, if it's okay with you, I would like to continue today. And we would -- I agree with you; we would like to move for a 2004 right away. But -- you know, while we have, you know, Mr. Danzik here, you know, and bearing in mind the interruption issue, I think I would like to continue and perhaps cover some other topics and then we'll circle back in greater detail once we can have a 2004.

Page 173

MR. MORSE: Okay. Just keep in mind, the transcript is going to be -- I mean, it's going to be horrible. It's just -- and I -- you know, I don't know what value it will be. But that's fine. I mean, if you want to continue until 5:00, I told you I'd give you that time so...

MR. WURTZEL: Well, I appreciate it. And I will try to speak, you know, slower and -- and, you know, more clearly. And if it's not -- you know, if you can't hear me or Mr. Danzik, then certainly let us know (inaudible).

MR. MORSE: Well, part of the problem is, when we have you on mute here, we have -- you know, we've had a few discussions. So we've had -- you know, several people talking at once. So I just think some of that's going to -- you know.

Page 174

```
 1        That's the only problem with
 2   341s and doing it -- doing it in
 3   this fashion without an orderly
 4   2004.  They're just horrible
 5   records at times.
 6        But that's fine.  If you
 7   want to continue, we can continue.
 8        MR. WURTZEL:  Well, can I
 9   make a suggestion?  I would like
10   to continue and hopefully we'll --
11   we'll have a good court reporter
12   who can, you know, get as much of
13   this as possible.
14        You know, maybe the way to
15   do this, so that we can have an
16   accurate record, would be to have
17   a 2004 exam in person so we don't
18   have these types of issues as --
19        MR. MORSE:  Well, I agree.
20   I agree.  I think Mr. Danzik needs
21   to be here in person.  I think
22   you've raised significant issues.
23   I want to -- I haven't looked at
24   your e-mail yet.  I just feel it's
```

Page 175

```
 1   given to me too soon prior.  I had
 2   a busy morning.  So I'd like to
 3   look at that and see what
 4   information's in there and then
 5   talk to Brad.  He can walk me
 6   through if I have any questions.
 7        But, you know, I -- this
 8   related (inaudible) at DAS is
 9   certainly raising red flags aside
10   from the gambling issues so...
11        MR. WURTZEL:  Fine.  So
12   let's -- I think it makes sense
13   then -- we'll do the best that we
14   can.
15        MR. MORSE:  I can't --
16   you're cutting out again.  What
17   did you say?  I'm sorry.
18        MR. WURTZEL:  All right.  I
19   think, you know -- I mean, it
20   makes sense to continue and do the
21   best that we can here, you know,
22   to keep this as clean as possible,
23   and then we'll get a 2004, you
24   know, in person as soon as
```

Page 176

```
 1   possible.
 2        MR. MORSE:  Okay.
 3   BY MR. WURTZEL:
 4        Q.  Mr. Danzik, given the
 5   concerns that the Trustee has just raised
 6   regarding the transcript, do you agree to
 7   appear in person for a 2004?
 8        A.  I'm going to follow whatever
 9   the Court tells me I have to.
10        Q.  You will only appear in
11   person if the Court directs you to?
12        A.  I mean -- I mean, my
13   attorney and what's required of me
14   (inaudible) this Chapter 11.
15        Q.  Let me ask it a different
16   way.
17        MR. WURTZEL:  Mr. Morse, if
18   you want to characterize it a
19   different way, then I'll let you.
20   BY MR. WURTZEL:
21        Q.  Will -- Mr. Danzik, if we
22   request that you appear for a 2004 exam
23   in person so that we can have a clean
24   record, will you agree not to oppose that
```

Page 177

```
 1   request?
 2        A.  I would have to talk to my
 3   attorney about all of my legal options.
 4   I have no idea what that entails.
 5        MR. WURTZEL:  Mr. McCartney,
 6   will you agree not to oppose an
 7   in-person 2004?
 8        MR. MORSE:  You're off.
 9        MR. MCCARTNEY:  Can you hear
10   me?  We've been muting and I don't
11   know if we're mute now or not.
12        MR. WURTZEL:  Yeah.  Mr. --
13   I didn't hear a response.  I was
14   asking whether you, Mr. McCartney,
15   will agree not to oppose an
16   in-person 2004 exam.
17        MR. MCCARTNEY:  Can you hear
18   me now?
19        MR. WURTZEL:  Yes, I hear
20   you.
21        MR. MCCARTNEY:  Okay.  We --
22   there's no light to tell us
23   whether mute it on or off and I
24   couldn't tell.
```

Page 190

1  That's not that hard.
2      Q.  Okay.  Well, thank you for
3  agreeing.  You will agree to give that to
4  your attorney in the next week and agree
5  for him to produce it to us?
6      A.  A week or so depending on
7  how long I'm on -- you know, I'm on the
8  road and with all my other work that I
9  gotta do.  But I know that I can get
10  access to that and I give it to
11  (inaudible).  It's not a problem.
12     Q.  Thank you for agreeing to do
13  that.  I just want to understand.  In
14  your contract with Danzik Applied
15  Sciences -- and by the way, what type of
16  contract is that?  Is that an employment
17  agreement?
18     A.  I have a couple of different
19  contracts with DAS.  Most of it is
20  contract work so that the contract work
21  passes through -- and most of that's done
22  (inaudible), you know, God forbid I have
23  an accident in the field or, you know,
24  something happens to me.

Page 191

1      Q.  You produce contracts --
2      A.  It's basically -- yeah.
3  Yeah.  I'll talk to my attorney about it.
4  If he has no objection, yeah.  I -- you
5  know, I don't see why -- what's --
6  there's nothing in there to hide.
7          MR. WURTZEL:  Mr. McCartney,
8      do you have any objection to
9      producing the agreements that
10     Mr. Danzik has with Danzik Applied
11     Sciences?
12         MR. MCCARTNEY:  No.  I think
13     I've seen copies of both of them.
14     I don't want Dennis to make
15     promises that he's going to get
16     all this stuff done by Monday and
17     then not come through.  I'm
18     thinking we're putting --
19         THE WITNESS:  No.  I said --
20         MR. MCCARTNEY:  -- a little
21     more heat on you than we need to.
22         THE WITNESS:  -- I'm not
23     producing that by -- by Monday.  I
24     said as soon as I possibly can.

Page 192

1      It might take me a week or two,
2      but I will get them.
3  BY MR. WURTZEL:
4      Q.  Fine.  So let's say two
5  weeks from today you get that to your
6  counsel who will produce it to us within
7  the next two weeks.
8          MR. WURTZEL:  Does that work
9      for everyone?
10         THE WITNESS:  I don't want
11     to set a firm deadline, but I --
12     in approximately that timeline I
13     believe I can get it.
14         MR. WURTZEL:  Okay.
15         MR. MORSE:  Well, let me
16     just interject.  We are going to
17     file a 2004 motion so we have
18     something formal with the court
19     requesting all -- not only
20     those -- that employment contract
21     between DAS and Mr. Danzik, but
22     also any contracts between -- DAS
23     has with any third party that --
24     you know, or source of revenue,

Page 193

1      whatever, it's going to be pretty
2      broad.  I mean, I think we need to
3      really understand what DAS is,
4      what funds have flowed through
5      those and that entity's accounts.
6          So I don't want to commit
7      our office to, you know, any sort
8      of disclosure agreement here.  I
9      want a court order requiring all
10     that information turned over
11     and -- so that's the route we're
12     going to go on.  You all can
13     obviously agree (inaudible).
14         MR. WURTZEL:  I think that
15     makes sense.
16  BY MR. WURTZEL:
17     Q.  And, Mr. Danzik, do you --
18  are you aware that in the Arizona
19  judgment enforcement action all these
20  documents have been requested and you've
21  refused to produce them?
22     A.  I haven't refused to produce
23  any document.
24     Q.  Okay.  Are you aware that

Page 226

1   commit to not opposing a request
2   to do that in person, and
3   Mr. McCartney said that he would
4   not oppose it.  You know, I'm
5   relying on (inaudible) the
6   representations here.  If I
7   mischaracterized them then --
8       THE WITNESS:  I didn't -- I
9   didn't -- I want to make it clear
10  I didn't agree to anything.
11      MR. WURTZEL:  Your counsel
12  agreed on your behalf.  Is that
13  right, Mr. McCartney?
14      THE WITNESS:  No.  No.
15      MR. MCCARTNEY:  What are
16  you -- what are you particularly
17  addressing?
18      UNIDENTIFIED MALE:  Will he
19  appear in person.
20      MR. WURTZEL:  We discussed
21  before the need to do a 2004 in
22  person, and I asked you,
23  Mr. McCartney, whether you would
24  agree not to object to having an

Page 227

1   in-person 2004, and then you said
2   that you would -- that you would
3   agree to that.
4       MR. MCCARTNEY:  I'll visit
5   with Dennis about that, but I
6   don't change my mind easily.
7       MR. MORSE:  Well, I -- I
8   did -- this is Mr. Morse.  I did
9   hear, Ken McCartney agree to that.
10      But as part of the 341
11  process, we're going to require
12  Mr. Danzik to be here in person.
13  And the Office of the Trustee
14  is -- at least it's been my
15  experience -- when dealing with
16  those issues before the Court, the
17  Court has always deferred to the
18  U.S. Trustee on how to handle 341
19  meetings.  So that's our
20  requirement.
21      MR. MCCARTNEY:  (Inaudible)
22  pay any money to fight that issue
23  (inaudible).
24      MR. MORSE:  I suppose -- I'm

Page 228

1   sorry, (inaudible).  I didn't
2   hear.  What did you say?
3       MR. MCCARTNEY:  I said it
4   doesn't make sense to fight an
5   issue that you can't win.
6       MR. MORSE:  Yeah.  I think
7   that's going to be a difficult
8   issue to overcome.  I think
9   in-person -- in-person --
10      MR. WURTZEL:  I'm sorry.
11  (Inaudible) breaking up a little
12  bit.  You were saying that it was
13  the U.S. -- position that the 2004
14  exam should be in person, correct?
15      MR. MORSE:  Well,
16  effectively, yes.  As a practical
17  matter.  Because we're going to
18  have them done at the same time.
19  We're going to continue the 341
20  meeting at the same time as the
21  2004 exam; and the 341 meeting
22  we're going to require that
23  Mr. Danzik be here in person.
24      And as to the 2004 exam,

Page 229

1   Mr. McCartney already made the
2   representation on the record that
3   he wouldn't oppose an in-person
4   appearance.  So I really don't
5   think this is going to be much of
6   an issue.  And if it gets before
7   the Court, I presume the Court
8   will defer to the U.S. Trustee's
9   office, as it has done in the
10  past, on how to conduct 341
11  meetings.
12      So, you know, Mr. McCartney
13  and Mr. Danzik can talk it over,
14  but I'm not sure -- as
15  Mr. McCartney mentioned here, and
16  I don't want to misstate what he
17  said -- that it's not a battle
18  that you -- you know, why fight a
19  battle that's not -- that you're
20  not going to win so -- but again,
21  they can have that conversation.
22      But that's our position at
23  this point in time.
24      MR. WURTZEL:  Thank you.

MAGNA LEGAL SERVICES